(C. D. 736)

P. Fred'k Obrecht & Son v. United States

United States Customs Court, Third Division

(Decided February 19, 1943)

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Frank X. O'Donnell, Jr.*, special attorney), for the defendant.

Before Cline, Keefe, and Ekwall, Judges

Cline, Judge: This is a suit against the United States in which the plaintiff seeks to recover a part of the duty assessed at the rate of $1.04 per 100 pounds, as "wheat flour," under paragraph 729 of the Tariff Act of 1930. The merchandise was invoiced as "feed wheat flour." Plaintiff claims in his protest that duty should have been assessed at 5 per centum ad valorem under paragraph 730. The protest was amended by adding the claims that the merchandise is dutiable at 5 per centum ad valorem under paragraph 731, as amended by the trade agreement with Canada (T. D. 49752); at 7½ per centum

ad valorem under paragraph 1555, as amended by the trade agreements with Canada and the United Kingdom (T. D. 49752 and T. D. 49753); or at 10 or 20 per centum ad valorem as nonenumerated unmanufactured or manufactured articles under paragraph 1558. Counsel for the plaintiff limits his argument in his brief to the claim that the merchandise is dutiable at 5 per centum ad valorem under paragraph 730, as amended by the trade agreement with Canada.

The pertinent parts of the competing provisions in question read as follows:

PAR. 729. * * *; wheat flour, semolina, crushed or cracked wheat, and similar wheat products not specially provided for, $1.04 per one hundred pounds.

PAR. 730. [As amended by the trade agreement with Canada, T. D. 49752]. Bran, shorts, by-product feeds obtained in milling wheat or other cereals, 5% ad val.

The plaintiff introduced the testimony of Mr. George F. Obrecht who is the proprietor of the importing company. He testified that he had been in the business of importing and dealing in feed products, including wheat feed flour, for many years; that he did not handle or deal in wheat flour, but only in wheat feed flour; that all of the merchandise covered by the entry herein involved was imported and used for poultry-feed purposes; that this particular shipment, although it had under 1 per centum ash content, was inferior to the ordinary type that he imported for the reason that it contained lumps about the size of a pea and was slightly moldy; that he had to recondition it by grinding before it could be used even for poultry feed purposes; that it was second clear or feed flour, not good enough for bread baking or the use of the baker; that importations previous and subsequent to this one had been returned at 5 per centum ad valorem under paragraph 730 as modified by the trade agreement with Canada; that this shipment, like the others, had been ordered to contain at least 1 per centum of ash, as 1 per centum ash generally had been regarded as a dividing line between wheat flour which might be used for human consumption and wheat feed flour for feeding purposes; that this particular shipment was found to contain slightly under 1 per centum of ash, namely, $\frac{9}{10}$ of 1 per centum, but, because of the objectionable lumps and its partially moldy state, it had to be reconditioned. The witness explained the different products obtained by the milling of wheat as follows:

Q. Do you know how merchandise like this imported in suit is treated or produced in the foreign country?—A. Yes.

Q. What is the basis of your knowledge?—A. Foreign separation is the same as our domestic, having our same machinery. In the manufacture of flour there is the patent flour, then comes the straight flour, then first clear flour and second clear flour. Shall I go further?

Q. Yes.—A. Then there is a product known as "red dog" used in hog feed. Then from there we go to white middlings, then the next straining that would come off would be middlings, then the next would be bran, which is the last.

On cross-examination the witness was asked and answered the following questions:

X Q. Where does the wheat flour come off which is used for human consumption purposes?—A. The patent, the first and the second patent and straight flours for human consumption, and the first clear flours are used by bakers for mixture in rye flours. Anything under that is feed.

X Q. If this merchandise hadn't had those lumps, could it have been used for any baker's purposes?—A. According to that analysis I would say, yes. I think it tested .80 of ash. It would be one-fifth less than was thought would be in feed flour, and Pillsbury, and other good flour would test about .80.

Counsel for the defendant argues in his brief that the provision for wheat flour in paragraph 729 covers wheat flour in all of its forms, including that used for food for animals as well as that for human consumption, citing *Schade & Co.* v. *United States*, 5 Ct. Cust. Appls. 465, T. D. 35002; *Atwood-Stone Co.* v. *United States*, 5 Ct. Cust. Appls. 472, T. D. 35004; *United States* v. *General Hide & Skin Corp.*, 11 Ct. Cust. Appls. 78, T. D. 38731; *Tower & Sons et al.* v. *United States*, 11 Ct. Cust. Appls. 157, T. D. 38948; *Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. (Customs) 464, T. D. 47464.

In *Schade & Co.* v. *United States, supra*, frozen wheat suitable only as animal feed was held dutiable under the provision for "wheat" in paragraph 242 of the Tariff Act of 1909, and, in *Atwood-Stone Co.* v. *United States, supra*, wheat, which had been stored in a moist condition and had become "bin burned" and was subsequently heated to remove the odor and check fermentation, was held dutiable as wheat under the same provision although it was fit only for animal feed. In both of those cases the importers claimed that the damaged wheat was dutiable as a nonenumerated unmanufactured article.

In *United States* v. *General Hide & Skin Corporation, supra*, the court held that cooked rabbit meat in hermetically sealed tins was dutiable under the provision for "game" in paragraph 227 of the Tariff Act of 1913 rather than under the provision for "meats of all kinds, prepared or preserved" in paragraph 545.

In *Tower & Sons et al.* v. *United States, supra*, boiled cider was held dutiable under the provision for "cider" in paragraph 202 of the Tariff Act of 1913 rather than under the provision for "fruit juices, and fruit sirup" under paragraph 247. That decision rested on the commercial designation of the article as "boiled cider" and that the merchandise was never dealt in as "apple juices or apple syrup."

In *Nootka Packing Co. et al.* v. *United States, supra*, the court held that cooked minced clam meat in cans was dutiable under the provision for "clams, clam juice, or either in combination with other substances, packed in air-tight containers" in paragraph 721 (b) of the Tariff Act of 1930 rather than under the provision in paragraph 1761 for "shellfish * * * prepared or preserved in any manner (including pastes and sauces), and not specially provided for." The

court, in announcing the applicable principle of construction, which was also applied in all of the other cases cited, said:

> The clear weight of the authorities on the subject is that an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of said article. Such is the situation here, and the trial court properly held the imported goods to be dutiable under said paragraph 721 (b).

> It seems inconceivable that the Congress, in attempting to protect the clam industry in the United States, should intend to free list such clams if they were cut into pieces. In our opinion, no such conclusion is required. The imported goods are clams, and should be classified as such.

The court distinguished a number of decisions in which the rule of construction quoted in the above excerpt from the court's decision was not adhered to. This review is as follows:

> The appellants contend that this case is controlled by another line of cases, exemplified by the pistache nuts case, *United States* v. *Sheldon & Co.*, 14 Ct. Cust. Appls. 228, T. D. 41708. In that case, pistache nuts, roasted and salted, were held by a majority of the court to be edible nuts, prepared or preserved, rather than under the designation "pistache nuts." However, that case did not rest upon the competition between pistache nuts and edible nuts, prepared or preserved, alone, but was based largely upon the fact that the Congress, in enacting the provision for edible nuts, had repeated the expression, "not specially provided for," in such a way as to compel the court to the conclusion that what the Congress had in mind was edible nuts, prepared or preserved, which had not been otherwise specially provided for, rather than as edible nuts which had not been specially provided for.

> The appellants also cite two cases, *United States* v. *La Manna et al.*, 14 Ct. Cust. Appls. 123, T. D. 41647, and *United States* v. *Pacific Trading Co.*, 14 Ct. Cust. Appls. 131, T. D. 41649. There the competition was between a statutory provision for onions, and another for vegetables, pickled, or packed in salt, brine, oil, or prepared or preserved. In each of these latter cases, the decision rested largely upon the fact that onions had been uniformly in previous acts, and in the act then under consideration, dutiable by the bushel or pound, and it was thought by the court that this, together with a consideration of the legislative history, compelled the conclusion that only onions in their natural state were intended to be included in the *eo nomine* provision for onions. Hence, the onions involved in the cases there at bar, being pickled, were held to be more properly dutiable under the pickled or prepared vegetable provision. These cases were followed by *Budlong Pickle Co.* v. *United States*, 16 Ct. Cust. Appls. 174, T. D. 42808.

> Other adjudged cases on the subject will be briefly commented upon.

> *Breman* [Brennan] v. *United States*, 136 Fed. 743, wherein limes, in brine, were held by the court to be classifiable as "fruits in brine" rather than as "limes," is relied upon by appellant. An examination of that case shows that limes in brine were different in character and use from fresh limes; that there was a commercial designation distinguishing limes in brine from fresh limes, and a long established administrative practice distinguishing the same.

> The case of *United States* v. *Reiss & Brady*, 136 Fed. 741, also relied upon, is one where commercial designation distinguished between "figs" and "fruits preserved." Lacomb, C. J., in disposing of the matter, was of the opinion that in trade and commerce the competing paragraphs described different articles.

*Stone & Co.* v. *United States*, 7 Ct. Cust. Appls. 173, T. D. 36492, involved currants, crushed and ground into a mass. These were held to be "fruits, * * * prepared," rather than as "currents." This case approaches closely the matter involved here, and is strongly relied upon. However, it will be noted that the court there said: "The importation has completely lost its identity as currants. It is an indeterminate mass or pulp. It is, in fact, a material prepared or made from currants, the ultimate use of which is in the manufacture of wines. Its general and more diversified uses as currants have thus been destroyed or limited."

No such facts appear here. So far as the record goes, the imported product before us is adaptable to exactly the same uses as would be whole clams.

*Malouf* v. *United States*, 1 Ct. Cust. Appls. 437, T. D. 31502, is cited. There a product made of wheat, ground and cooked, was held not to be within the designation "wheat," as it had ceased to be wheat and was entirely unsuitable for any wheat use.

The case of *Kwong Yuen Shing* v. *United States*, 1 Ct. Cust. Appls. 16, T. D. 30774, is brought to our attention. In that case, preserved duck meat, salted, pickled, dried in the sun and packed in tins, and sometimes packed in peanut oil, was held to be "meats prepared or preserved" rather than "poultry dressed." It appears from the opinion of the court that this holding rested upon proof of commercial designation. This further appears from reference to the opinion of this court in *United States* v. *General Hide & Skin Corp.* 11 Ct. Cust. Appls. 78, T. D. 38731, where the decision in the *Kwong Yuen Shing* case, *supra*, is commented upon. In *United States* v. *General Hide & Skin Corp.*, *supra*, rabbit meat, cooked and canned, was, in the absence of commercial designation, held to be rabbits, and to come within the designation "game" rather than as "meats * * * prepared or preserved."

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In *Smith* v. *United States*, 168 Fed. 462, meat of the quail, lark, and young chickens, prepared by cooking and packed in airtight cans for preservation, was held to be classifiable as "meats of all kinds, prepared or preserved," rather than as "poultry dressed." This case, also, went off on proof of the established meaning of the word "poultry."

Counsel for the plaintiff in the instant case cites, in his brief, the decision in *National Carbon Co., Inc.* v. *United States*, 47 Treas. Dec. 1045, Abstract 49279, in support of his contention that wheat flour which is not fit for human consumption is classifiable under paragraph 730 rather than paragraph 729. In that case the court held that such flour was dutiable under paragraph 730 of the Tariff Act of 1922. The provisions in paragraphs 729 and 730 of the act of 1922, except as to the rates of duty, are the same as those herein under consideration. In the Summary of Tariff Information of 1929, the case cited by the plaintiff is listed among the decisions relating to the products in paragraph 730 on page 1217, wherein the following appears:

*Wheat flour* not fit for human consumption was held dutiable at 15 per cent under paragraph 730. (Abstract 49279)

Congress is presumed to have had knowledge of the above-cited decision when it reenacted the provisions of paragraphs 729 and 730 of the previous act. It is a well-settled rule of statutory interpretation that in such case the provisions should be given the same inter-

pretation adopted by the court unless a contrary legislative intent clearly appears. *United States* v. *Kawahara*, 15 Ct. Cust. Appls. 231, T. D. 42242, and authorities therein cited.

The Treasury Department seems to have approved the construction adopted by the court in the case cited because on April 20, 1931, it rendered a like decision, an abstract of which is published in T. D. 44835 (1), reading as follows:

(1) *Second clear wheat flour.*—Which does not conform to the standards of flour promulgated by the United States Department of Agriculture and is not commercially fit for use as human food, held properly classifiable under the provision in paragraph 730 of the Tariff Act of 1930 for "by-product feeds obtained in milling wheat," dutiable at 10 per cent ad valorem. * * *.

The record shows that the merchandise herein involved is second clear wheat flour.

The uses of the products enumerated in paragraph 730 are described on page 1210 of the Tariff Information of 1929 as follows:

BRAN, SHORTS, BY-PRODUCT FEEDS OBTAINED IN MILLING WHEAT OR OTHER CEREALS, ETC.

Description and uses.—The by-products of milling, such as bran, shorts, middlings, and the by-products of other manufacturing operations as dried beet pulp, malt sprouts, and brewers' grains (dried) are used chiefly as feed for animals. Hulls are used as a filler or roughener in some grades of feed for livestock.

Wheat flour is described on page 1206 of the same volume as follows:

WHEAT FLOUR

Description and uses.—In modern flour mills, wheat is first cleaned and scoured and then subjected to grindings or "breaks" between several (usually four) sets of rollers. Thus the grain is slowly broken and the outer layers of hull or skin sifted out. These hulls are used for wheat feeds—bran, middlings, and shorts. The flours produced in the various breaks are blended to make the standard grades. About 72 per cent of the wheat is usually recovered as flour. Approximately 4½ bushels of wheat make 1 barrel of flour weighing 196 pounds and 70 pounds of feeds. A loss of 4 pounds occurs in the process. There are two principal commercial types of flour: The soft, starchy flours from soft wheats, used largely for pastry, biscuits, and crackers; and the granular flours from hard wheats, used for bread making. Hard-wheat flours yield a larger quantity of bread per unit of flour and bread made therefrom is lighter. Graham flour is the unsifted wheat meal ground from the whole wheat kernel.

The enumeration of "by-product feeds" in the provision under consideration undoubtedly has reference to byproducts obtained in milling wheat used as food for animals. It is a well-settled rule in statutory construction that a provision which indicates use prevails over one having an *eo nomine* designation. *Carter & Son* v. *United States*, 6 Ct. Cust. Appls. 253, T. D. 35475; *Downing & Co.* v. *United States*, 6 Ct. Cust. Appls. 447, T. D. 35984; *United States* v. *Hillier's Son Co.*, 14 Ct. Cust. Appls. 216, T. D. 41706; *Factor* v. *United States*, 15 Ct. Cust. Appls. 401, T. D. 42570; *United States* v. *A. W. Faber*,

*Inc.*, 16 Ct. Cust. Appls. 467, T. D. 43211; *Henry Pels & Co.* v. *United States*, 27 C. C. P. A. (Customs) 1, C. A. D. 51; *Arthur H. Thomas Co.* v. *United States*, 63 Treas. Dec. 470, T. D. 46248.

The evidence shows that second clear wheat flour, which is the quality of the commodity herein involved, is one of the byproducts obtained in milling wheat and that it is used solely for feeding chickens and is not fit for human consumption. Therefore, it belongs to the class of byproduct feeds described in paragraph 730, a product used for feeding animals.

In determining the proper classification of the merchandise in this case, we are confronted with three principles of statutory construction, namely,

1. An *eo nomine* statutory designation of an article without limitations includes all forms of such article.

2. When a given term in a tariff act has been judicially interpreted and thereafter reenacted in substantially the same language, it will be given the same interpretation in the later act unless a contrary legislative intent clearly appears.

3. A provision which indicates use prevails over one having an *eo nomine* designation.

Judicial construction of tariff terms is employed by the courts solely for the purpose of determining Congressional intent. We are of opinion that the second rule above described forms a better basis of determining Congressional intent than the first because, if Congress had intended to give a different meaning to the words "wheat flour" than that found by the court under the previous act, it would have used language in the subsequent act which would have manifested such intent. In the case of *United States* v. *De Boer & Dik*, 6 Ct. Cust. Appls. 30, T. D. 35273, the court, in construing the meaning of the words "beans * * * prepared or preserved" in the Tariff Act of 1909, adopted the meaning ascribed by the court to the word "beans" in the Tariff Act of 1897. The court said:

In G. A. 3979 (T. D. 18523) the board, construing a provision for "beans, 20 per cent ad valorem," in competition with a provision for "vegetables in their natural state," held that string beans fell within the former paragraph. The word "beans" was continued in the act of 1897 and is carried into paragraph 251 of the act of 1909, above quoted. The continuance of this term in the later tariff laws carries a strong presumption that it was employed in the sense affixed by judicial interpretation. *Latimer* v. *United States* (223 U. S., 501, 504).

In *Nootka Packing Co.* v. *United States, supra,* the court enumerates "judicial decisions" among the exceptions to the rule of construction designated above as number 1, as shown in the excerpt from that decision quoted above. We are of opinion that the rule enumerated in the above paragraph 2 predominates over that in paragraph 1. Furthermore, an application of the rule in paragraph 3 will reach the

same conclusion in this case as an application of the rule in paragraph 2.

We find that the merchandise herein involved consists of byproduct feeds obtained in milling wheat, not fit for human consumption, and, although it is in the form of wheat flour, we are of opinion that it is the kind of material intended by Congress to be classifiable as byproduct feeds under paragraph 730. We hold the merchandise dutiable at 5 per centum ad valorem under the provision for "byproduct feeds obtained in milling wheat" under paragraph 730 of the Tariff Act of 1930, as modified by the trade agreement with Canada, T. D. 49752. Judgment will be entered in favor of the plaintiff.